# Wytheville

## ARTHUR W. MAWYER v. SOUTHERN RAILWAY COMPANY.

June 10, 1937.

Present, All the Justices.

The opinion states the case.

*Paul H. Coleman* and *J. Tinsley Coleman, Jr.,* for the plaintiff in error.

*Williams & Robertson* and *Thomas B. Gay,* for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

Arthur W. Mawyer, the plaintiff below and plaintiff in error here, was a track foreman who had been in the employ of the Southern Railway Company for twenty-five years. While his home was at Monroe, in Amherst county, Virginia, where the accident occurred, he was at that time in charge of a section of the company's track at, or near, Charlottesville, Virginia, where he had been working for about a month.

On February 16, 1935, he quit work about four-thirty p. m., and, according to his custom, on that Saturday afternoon he returned on train number 35 of his employer, to spend the week-end with his wife and family. He used a pass on the train, furnished him by the railway company, and arrived at Monroe about six p. m.

Monroe is a railway yard and terminal point, and the Southern Railway Company there owns, maintains and

operates as a part of its railway system a depot, a yard office, a round-house, a turn-table, shops and a large number of separate tracks for the main line, sidings and spurs, which criss-cross each other at various points. The tracks are used, among other purposes, for making up trains, coupling and switching cars and engines from and to trains, and for all the usual purposes of a railway yard and terminal. The yard is continually busy with the movement and shifting of trains and cars, with the sounding of whistles, the ringing of bells and with all the noises and sounds that usually accompany such ceaseless activity.

The tracks in the yard run practically north and south, south being in the direction of Lynchburg, and north towards Charlottesville. At some points in the yard and near where the hereinafter described accident occurred, there are twenty or more separate tracks. To the west of this series of tracks are the turn-table, the round-house and a toilet. The station and the village of Monroe, where most of the railway employees live, are to the east of the tracks. On that side, a little more to the north, is located another toilet of the company.

Train number 35, a through passenger train, came in on the south-bound main line tracks, and according to its custom, did not stop at the station, but moved up to a point near the water column, and its passengers were discharged on the west side, or the side towards the round house and toilet.

The weather was raining, it was cold and the wind was blowing. Mawyer got off the train on the west side and walked across a series of tracks to the toilet behind the round-house. According to his testimony, he stayed in the toilet until around seven o'clock. He did not have a rain coat. He alleges that the reason for his delay was that the rain thereafterwards increased. Even when he left it had not entirely stopped.

During the period of time while Mawyer was in the toilet, a train crew composed of an engineer, a fireman, a conductor, a brakeman and a trainman, were engaged with yard engine number 1879, in making up a train to go west. They had picked up a combination car, and placed it on track number

three, where there was then waiting a gondola car. Subsequently, they went to track number two, and got a mail coach, which they brought and coupled to the two cars already on track three. They afterwards brought a baggage car and an express car, and coupled them to the above cars, making five cars in all on track three, which had been picked up and placed by the same yard engine and crew on that track. During these operations, the yard engine was headed south, and its headlight was, therefore, shining south. The engineer was sitting on the west side and the fireman on the east side. It was necessary to push these five cars up track three to a steam plug, and in doing so, with the engine backing, the cars were pushed north. During this last operation, the trainman, named C. L. Proffitt, equipped with a lantern, was assigned and did go to the north end of the last car headed north, the gondola car, for the purpose of giving the necessary directions and signals to the engineer by means of his lantern. He and the engineer testified that he walked on the west side of the north lead end of the gondola car at the same rate of movement as that of the train. It is uncontradicted that the train was proceeding only two or three miles an hour, or, as stated "just about as fast as a man walks," and subject to a "stop as quick as the snap of a finger."

Mawyer said he left the toilet after waiting in vain for the rain to let up, with the intention of going to the station on the east side of the tracks, and then to a store to pay a bill. He started across the tracks near the round-house, having to cross a maze of twelve or more tracks until he came to a point between track number three and track number four, a short distance southwardly from the steam plug, where the made up train was bound. He stated that he looked up and down the tracks, saw some engines standing on tracks four and five, but did not see any trains moving; and that there was considerable noise in the yard as a result of escaping steam from the engines and other operations incident to a railway yard. Then, said he, he commenced to walk off the ties between tracks three and four, and towards the north, keeping his hat over his face to keep off the rain; that while so walking

without hearing or seeing anything, and after he had gone ninety odd feet, the next thing he knew something hit him, and that he believes it was the end of a car, but didn't know what part; that he was struck and thrown underneath the train and knows it to be a fact that several cars ran over him, but couldn't say that the engine ran over him; and that he knew nothing else until he woke up the next morning in the hospital.

The trainman, Proffitt, testified that from the point at which the last coupling had been made, which was about three hundred feet from the supposed scene of the accident, the train moved slowly and continuously to the point at which it stopped subsequent to the accident; that after making the last coupling, he took his position on the west side and on the front of the lead car; that while walking along with the car he had a lantern in his left hand motioning the engineer to come up, and for a part of such time he had hold of a grab iron on the car with his right hand; that he was looking ahead and had a clear view of the track, and he knows that Mawyer was neither in the track, nor between the two tracks when the cars were being shoved back. The engineer of the train verifies the position of the trainman. The evidence shows that the space between tracks three and four is somewhat close, although wide enough for a man exercising care to occupy a place of safety between two passing trains, and that the lights on top of the coal bins lighted up the yard almost a thousand feet in and around the area in which the train was working, and Mawyer claimed to be walking.

The plaintiff said that Proffitt told him when he first went to see him that he was riding on the top of the front end of the lead car, and on the second time he went to see him that he was walking as related above. In either event, it would not have been difficult to have seen a man at the place at which Mawyer claimed to have been, and if he had been at such a place, Proffitt could have had a clear and unobstructed view of him.

The first information that the train crew claim to have had of Mawyer's presence, was after the train had been stopped

at the steam plug, with its headlights shining towards Lynchburg. Another employee of the company, standing a few feet opposite the cab of the yard engine, called to the engineer "Don't go ahead. There's somebody laying in the track." The engineer and fireman got off the engine, walked down the track for seventy-five feet south of the engine, and found Mawyer lying close, right up beside the east rail, already injured. He was picked up and carried to the hospital in an unconscious condition. His left arm was found to be badly mangled, and it was necessary to amputate it. The only other injury was a small scalp wound.

Suit was instituted by notice of motion with the right of recovery based upon common law rights, and not under the Federal Employers' Liability Act, 45 U. S. C. A. § 51 et seq. There was a verdict for the plaintiff in the sum of ten thousand dollars. On motion of the defendant, the trial court set aside the verdict on the grounds that it was contrary to the law and to the evidence, and without evidence to support it, dismissed the action and entered a final judgment for the defendant.

The single assignment of error is to that action of the court.

On account of this sole assignment of error, we have related from the mass of evidence, only such as we think is most material and pertinent. The principal question is whether there was sufficient credible evidence adduced on behalf of the plaintiff, under the law applicable to the case, to sustain the verdict of the jury.

In approaching this question, it is evident that no one actually saw the injury inflicted, nor is the plaintiff himself clear as to how he received the injury. He claims to have been struck by a train traveling only as fast as a man could walk while he was walking in the same direction as the train was proceeding, and after he had walked in that direction ninety odd feet; that at the time of impact he was beyond the edge of the ties and between two tracks and, therefore, to the side of the moving train at the forward or lead end of which a trainman was walking along the very path that he claimed to occupy, and in which the trainman had moved at

the same rate of speed for about three hundred feet; that in this position, he was hit and thrown to the right between the two rails of a track, and his left side was the only side injured, although several cars passed over him; and yet he was finally found between the rails over which the entire train, including the engine, had passed, lying next to the east rail of the track.

The plaintiff's case can rest on no higher evidence than that of himself and his witnesses. The mere fact of injury does not justify a conclusion that it was negligently inflicted. The nature of the plaintiff's evidence is such that it is inconsistent with the ordinary experience of mankind. We cannot understand how, if he had been struck, in the manner described, on his left side by the left-hand side of the train, he could have been thrown diagonally to the right, or how such disaster could have overtaken him at the speed in which the train was traveling. If he were overtaken, at such rate of speed the impact could have been of only slight force. It cannot be reconciled with the evidence of the engineer and of the trainman at the head of the train. The latter would have walked into the plaintiff if he had been where he said he was.

In addition, the physical evidence proves that no man of the size and weight of the plaintiff could have had yard engine number 1879 pass over him at the point in question, and not be terribly mangled. The lowest portions of that engine, the ash pan, the brake rigging and the shaker rods afforded about eight inches clearance above the ties. A standing freight car with standard rigging, gave only about two and one-half inches greater clearance, and it was only by turning and squirming that a man of the size of the plaintiff, could barely squeeze through an opening under such a car when stopped, with his mind directed on the operation, much less one who has been knocked into an irregular and awkward position beneath same. Nor is there any explanation of how, after the train passed, he was found between the two rails of the track.

We are then left in the position that there is an absence of satisfactory evidence as to the manner in which, and the

means by which the plaintiff was injured. The whole occurrence becomes a matter of speculation, conjecture or surmise. Since the plaintiff has failed to make out a case for himself, we cannot make out one for him, nor can we approve a recovery which is not satisfactory to our reasoning. We think it charitable to say that the plaintiff's memory does not recall the circumstances under which he received his injury. His testimony is in itself incredible. *Southern Railway Company* v. *Hall's Adm'r*, 102 Va. 135, 137, 45 S. E. 867; *Southern Railway Company* v. *Adams*, 129 Va. 233, 105 S. E. 566; *Norfolk & Western Railway Company* v. *Strickler*, 118 Va. 153, 86 S. E. 824.

In connection with the sole assignment of error, counsel for the plaintiff contends with great ability and much earnestness, that the plaintiff was a licensee in the yard of the company; that there was owing to him by the company the duty of keeping a proper lookout for his safety; that, if this had been done, he could have been seen in time for the accident to have been avoided; and that the jury were entitled to apply to the case the doctrine of the last clear chance.

The answer is that Mawyer was a track employee, a section foreman, who, by reason of his employment, was familiar with the conditions of the railway yard and terminal, and knew the risks and hazards incident to crossing them. He was returning home from his work, and was traveling over no defined path across the tracks. His return trip was delayed only by his own necessity and desires, and the direction taken was of his own choosing. There was not a scintilla of evidence that he was actually seen by other employees of the company at the time of his injury.

Upon such a statement of facts, the weight of authority, in Virginia and elsewhere, is that no duty of outlook is required of the railway company. If he had been on duty as a track foreman, he would have been held to have assumed the risks of danger, and have been required to rely upon his own watchfulness. Certainly, when he had gotten off duty, and was on his way home from such duty, going across and along the tracks of his employer, no higher obliga-

tion to maintain a lookout for his safety rests upon his employer. *Pittard's Adm'r* v. *Southern Railway Company*, 107 Va. 1, 57 S. E. 561; *Norfolk & Western Railway Company* v. *Belcher's Adm'x*, 107 Va. 340, 58 S. E. 579; *Chesapeake & Ohio Railway Company* v. *Nixon*, 271 U. S. 218, 46 S. Ct. 495, 70 L. Ed 914.

Having come to these conclusions, we do not reach any stage involving the question of the application of the doctrine of last clear chance.

Since the evidence does not sustain a reversal, all other issues become unimportant. The verdict of the jury being without evidence to support it, the judgment of the trial court in setting it aside and entering up judgment for the defendant will be affirmed.

*Affirmed.*